Anthony M. Alexis, DC Bar 384545
Enforcement Director
David Rubenstein, DC Bar 458770
Deputy Enforcement Director
Cynthia Gooen Lesser, NY Bar 2578045
Assistant Deputy Enforcement Director
Rina Tucker Harris, DC Bar 444550
Senior Litigation Counsel
rina.harris@cfpb.gov
Mary K. Warren, NY Bar 2557684
Enforcement Attorney
mary.warren@cfpb.gov
Jessica Rank Divine, NY Bar 4544573
Enforcement Attorney
jessica.divine@cfpb.gov
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (202) 435-9196
        Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Plaintiff, | Case No. 17-1278 |
| v. | |
| AEQUITAS CAPITAL MANAGEMENT INC., AEQUITAS MANAGEMENT LLC, AEQUITAS HOLDINGS, LLC, AEQUITAS COMMERCIAL FINANCE, LLC, CAMPUS STUDENT FUNDING, LLC, CSF LEVERAGE I LLC, AEQUITAS INCOME OPPORTUNITY FUND, and AEQUITAS INCOME PROTECTION FUND, | COMPLAINT |
| Defendants. | |

COMPLAINT                    1

Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), alleges the following against Aequitas Capital Management Inc., Aequitas Management LLC, Aequitas Holdings LLC, Aequitas Commercial Finance LLC, Campus Student Funding LLC, CSF Leverage I LLC, Aequitas Income Opportunity Fund, Aequitas Income Protection Fund ("Aequitas"):

## INTRODUCTION

1.      The Bureau brings this action against Aequitas for its abusive acts and practices in connection with private loans made to students at Corinthian Colleges, Inc. ("Corinthian"), which were funded or purchased by Aequitas. By funding these private loans, Aequitas enabled Corinthian to present a façade of compliance with federal laws requiring that a certain portion of a for-profit school's revenue come from sources other than federal student aid.  At the same time, Aequitas's funding of the private loans facilitated by Corinthian caused injury to Corinthian students by saddling them with what both Aequitas and Corinthian knew was high-priced debt with a high likelihood of default, which students had no way of knowing was only for a sham tuition charge solely to gain access to Title IV funds.  Aequitas has collected, and continues to collect, on these loans.

2.      Until 2014, Corinthian was one of the largest for-profit, post-secondary education companies in the United States, boasting more than 100 school campuses. Corinthian offered career-oriented programs which were marketed to potential students as a way to obtain jobs in their fields of study, including health care, business, criminal justice, and information technology. Crucial to persuading students to sign up for these programs and attend were Corinthian's deceptive promises of strong job placement and life-long career services.

3.      Corinthian was a public company that derived nearly all of its revenue from federal student aid – mostly loans -- taken out by its students under Title IV of the Higher Education Act of 1965 ("Title IV"). To qualify for Title IV funds, the federal government required that schools like Corinthian obtain a portion of their revenue – 10 percent during the period relevant to this action -- from outside sources besides Title IV funds. This is known as the "90/10 rule." Corinthian complied with the 90/10 rule by raising its tuition beyond what Title IV loans would cover, so that students were forced to finance a portion of the tuition from another source.  Knowing that its generally low-income students could not afford to pay this amount out of pocket, Corinthian established a private loan program, known as the "Genesis Loan Program," available only to its students.  Corinthian devised the Genesis Loan Program and presented it to Aequitas as a means of attracting Aequitas's investment in it. The Genesis Loan Program was expensive. It featured interest rates as high as 18% and significant origination fees.

4.      Under a 2012 change to the 90/10 rule, however, such a loan program could no longer be financed by the school in order to qualify as an outside source of revenue for the purposes of obtaining Title IV funding. So, starting in 2011, Corinthian made an arrangement with Aequitas in which Aequitas purchased existing student loan portfolios and began funding or purchasing new Genesis Loans originated by depository institutions. Such an arrangement made it appear as if Corinthian were not funding the loans. Yet, central to the arrangement was an agreement by Corinthian to purchase all the Genesis Loans that became delinquent more than 90 days, essentially shifting the risk of the program from Aequitas back to Corinthian.

5.      Aequitas knew that the underlying tuition charge that the Genesis loans funded, as well as the Genesis Loans themselves, was intended to provide no economic

COMPLAINT                                  3

benefit to Corinthian except access to Title IV funds. Default rates in the Genesis Loan Program were historically high – between 50 and 70 percent. Thus, the Genesis Loan Program essentially functioned as a loss leader for Corinthian, regardless of the outcomes for student borrowers.

6.      Aequitas was a necessary player in this scheme, which enriched Aequitas with performing loans at high interest rates and enabled Corinthian to continue in existence by keeping Title IV revenue flowing.

7.      Corinthian students, however, were never told that the portion of tuition funded by the Genesis Loans, as well as the loans themselves, were a sham to get access to federal funds. Indeed, Corinthian students were the ones left holding the bag, often with expensive debt that many would not be able to repay.

8.      Corinthian's deceptive scheme has ended in disaster. In September 2014, the Bureau filed a complaint against Corinthian for, among other things, engaging in deceptive acts and practices in connection with the Genesis Loan Program by inducing its students to take out loans by means of misrepresentations regarding the school's job placement rates and career services programs.

9.      In February 2015, amid governmental enforcement actions concerning its allegedly unlawful practices in marketing its educational and job placement support and in connection with the Genesis Loan Program, Corinthian sold more than 50 campuses.

10.      In April 2015, the U.S. Department of Education found that Corinthian had misrepresented job placement rates to students at certain Corinthian schools, and fined the company $30 million. In May 2015, Corinthian then closed its remaining campuses and filed for Chapter 11 bankruptcy protection.

11.    In October 2015, a federal court entered a default judgment in favor of the Bureau in another  case against Corinthian for violations of the Consumer Financial Protection Act, including for unfair and deceptive acts and practices in connection with the Genesis Loan Program.

12.    In November 2015, the U.S. Department of Education found that Corinthian, in hundreds of programs at 20 Everest and WyoTech campuses in California and Florida, misled students about their job prospects after graduation.

13.    In March 2016, the U.S. Department of Education also found that Corinthian misled students attending Everest and WyoTech campuses in 20 states about their job prospects after graduation.  These campuses were located in Massachusetts, California, Illinois, Texas, Georgia, Pennsylvania, Florida, Washington, Virginia, Ohio, West Virginia, Michigan, Minnesota, Nevada, Missouri, Indiana, Wisconsin, Oregon, New York, Utah, Maryland, New Jersey and Wyoming.

14.    As of March 31, 2017, Aequitas held a portfolio of these student loans with an unpaid balance of approximately $190.5 million, including approximately 46,327 loans made to approximately 41,290 individual borrowers.  Aequitas continues to collect payments on performing loans.

## NATURE OF THE ACTION

15.    The Bureau brings this action under sections 1031(a), 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564, and 5565, for Aequitas's violations, from July 21, 2011 through the present, of sections 1031(a) and 1036(a)(1) of the CFPA, which prohibit abusive acts and practices.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

17.     Venue is proper in this district because Defendants are located, reside, and are doing business in Lake Oswego, Oregon.  28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

18.     Assignment to the Portland Division of this Court is proper because a substantial part of the events or omissions that gave rise to claims alleged in this Complaint occurred in Lake Oswego, Oregon in Clackamas County.  L.R. 3-2(b).

## PLAINTIFF

19.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to commence civil actions to enforce federal consumer financial laws, including the CFPA.  12 U.S.C. §§ 5564(a)-(b); 5481(14).

## DEFENDANTS

### Aequitas Entities

20.     Aequitas Capital Management Inc. ("Aequitas Capital") is an Oregon corporation formed  in 1993 with a principal place of business in Lake Oswego, Oregon. Aequitas Capital is the manager of ACF.  As the manager of ACF, Aequitas Capital is responsible for the overall operations of ACF, including the management of ACF's loan and investment portfolio.

21.     Aequitas Management LLC ("Aequitas Management") is an Oregon limited liability company with a principal place of business in Lake Oswego, Oregon. Aequitas Management owns 84% and exercises exclusive control over Aequitas Holdings, the sole owner and member of ACF and the sole shareholder of Aequitas Capital.

22.     Aequitas Holdings LLC ("Aequitas Holdings") is an Oregon limited liability company with a principal place of business in Lake Oswego, Oregon. Aequitas Holdings is the sole owner and member of ACF and the sole shareholder of Aequitas Capital.

23.     Aequitas Commercial Finance LLC ("ACF") is an Oregon limited liability company with a principal place of business in Lake Oswego, Oregon. ACF is the sole owner and member of at least seven subsidiaries that engage in the business of acquiring or investing in portfolios of trade receivables in the healthcare, education, transportation, and consumer credit sectors. ACF also holds ownership stakes in the Aequitas Funds and a number of other Aequitas-affiliated companies. ACF also has directly held or currently holds title to Genesis student loan promissory notes and/or the right to collect and receive existing and future principal and interest payments.

24.     Campus Student Funding LLC ("CSF"), formerly known as AFSG LLC, is an Oregon limited liability company with a principal place of business in Lake Oswego, Oregon.  CSF is owned by ACF and was created by Aequitas as a special-purpose entity for purchasing student loans.  CSF originally purchased all Genesis Loan notes sold to Aequitas entities, whether directly from Corinthian, the loan servicer, or the issuing bank.  CSF was the seller of the notes pursuant to Corinthian's commitment to purchase delinquent loans from Aequitas.  Thus, CSF has held or currently holds title to Genesis student loan promissory notes.

25.     CSF Leverage I, LLC ("CSF Leverage") was on Oregon limited liability company with a principal place of business in Lake Oswego, Oregon. CSF Leverage was owned by ACF and at one time held Genesis student loan promissory notes. CSF Leverage merged into CSF and no longer exists as a separate entity.

26.     The Aequitas Funds are various funds owned by the Aequitas entities described above. Aequitas Income Opportunity Fund is owned by ACF and holds, or has held, the right to collect and receive Genesis student loan receivables. Aequitas Income Protection Fund is owned by ACF and CSF and holds, or has held, the right to collect and receive Genesis student loan receivables. CSF Leverage I LLC f.k.a ASFG Leverage I LLC is, upon information and belief, owned by ACF and CSF and  has held the right to collect and receive Genesis student loan receivables.

### Common Enterprise

27.     At all times material to this complaint, Aequitas has operated as a common enterprise while engaging in the violations of Federal consumer financial law set forth herein.  Aequitas has conducted the business practices described herein through then interrelated network of companies described above that have common business functions, employees, and office locations.

28.     Aequitas has also shared operations and proceeds of the relevant activities associated with the allegations in this complaint.  For example, even though CSF initially purchased the Genesis Loans, the loans were sold to various other Aequitas funds or entities, including Aequitas Income Opportunity Fund, Aequitas Income Protection Fund, CSF Leverage Fund I, or ACF. Because Aequitas has operated as a common enterprise, each of the Aequitas entities is jointly and severally liable for the acts and practices described below.

*Receivership of Aequitas*

29.     Corinthian's repurchase of the delinquent Genesis loans was an important source of revenue for Aequitas. Corinthian's failure, and the cessation of the loan repurchases, caused Aequitas significant distress. Early in 2016, the lack of that revenue coupled with, among other things, alleged improprieties by Aequitas management, led the company to curtail operations.

30.     On March 10, 2016, the Securities and Exchange Commission ("SEC") brought an action in this court, alleging violations of the securities laws, including a scheme to defraud and misuse investor funds.   Pursuant to the SEC's request, the court on April 14, 2016 appointed a receiver to wind down the companies and distribute the remaining assets.  The receiver is not a party to this action.

## FACTUAL BACKGROUND

31.     In 2011, Aequitas became involved in private student lending by purchasing private student loans from Corinthian and participating in the operation of Corinthian's Genesis Loan Program.

32.     At that time, Corinthian was one of the largest for-profit, post-secondary education companies in the United States. With more than 100 school campuses, Corinthian operated schools under the following names:  Everest College, Everest Institute, Everest University Online, Everest University, Everest College Phoenix, Heald College, and WyoTech.  Corinthian offered career-oriented programs that were marketed to potential students as a way to obtain jobs in their fields of study, including health care, business, criminal justice, mechanical, and information technology.

33.     Most students attending Corinthian's schools were low-income and/or the first in their families to seek an education beyond a high school diploma. Many Corinthian students struggled economically.  For example, a 2011 Corinthian survey of campus operations indicated that over 57% of Corinthian's student population had a household income of $19,000 or less, and 35% of Corinthian's student population had a household income of less than $10,000.

34.     The great majority of students attending Corinthian's schools could not afford to pay the school's tuition out-of-pocket.  Students needed financial aid – mostly loans from either the federal government under Title IV or private sources – to pay Corinthian's tuition and fees. This was well known to Corinthian.

### *Corinthian Induced Students to Take Out Loans With Deceptive Representations About Job Placement Statistics and Career Services Offerings*

35.     Corinthian needed to convince students that paying its tuition, and taking on substantial debt to do so, would be a worthwhile investment in their future. Therefore, Corinthian deployed a series of misrepresentations about the likely employment outcomes for Corinthian students and the services Corinthian would provide to help them find jobs.

36.     Corinthian portrayed its educational programs as a way for students to secure better-quality careers.  For example, in promoting Heald College, Corinthian advertised, "[y]our education might mean the difference between a rewarding career or just another job." Similarly, Everest Colleges, Universities, and Institutes advertised on its websites that it provided students "[a] better career, a better life, a better way to get there."

Misrepresentations Concerning Job Placement Statistics

37.      Corinthian presented job placement rates that were misleading to consumers in several ways. For example, Corinthian represented to prospective and current students that its education would offer a "career," not "just another job," but in calculating and disseminating alleged job placement rates for graduates, Corinthian included jobs that lasted for just one day.

38.      In addition, Corinthian presented to students and prospective students falsified and overstated job placement rates.  Corinthian deliberately overstated the number of jobs that students obtained, undercounted the pool of "employable" graduates, thereby increasing the percentage of employed graduates out of all the "employable graduates", and engaged in a practice of paying employers to hire its graduates temporarily in order to inflate its job placement statistics.

39.      One way Corinthian inflated its job placement statistics was by counting a person as having been placed who only got a temporary assignment for a day with a promise of a second day of work. Corinthian could count that person within its employment statistics even if that person only worked for just one day.

40.      Corinthian took this deception one step farther by paying employers to hire its graduates for brief periods so that Corinthian could improve its job placement statistics.

Misrepresentations Concerning Career Services

41.      To convince students that they would achieve career success by taking out loans to pay for a Corinthian education, Corinthian also misrepresented the availability and the utility of its career services.

42.     Corinthian falsely promised prospective students that they would receive career assistance while enrolled, and lifetime career assistance after graduation. Corinthian promoted "career-focused education" and career services that were available "whenever you need help finding a job, or want some advice on improving your resume or interviewing skills." Corinthian further promoted that it "not only help[s] you find a job after you graduate, we help you find a job any time you need one, throughout your career... From graduation to retirement, we'll help you advance your career whenever you need it." Corinthian emphasized its nationwide network of employers.

43.     The actual services provided were limited, such as providing postings already publicly available from services like Craigslist.

44.     Moreover, after graduates obtained initial placements, Corinthian refused to provide any further assistance to them. This was particularly significant for students who received only temporary placements.

### The "90/10" Rule

45.     Corinthian engaged in these deceptions because it wanted to convince students to take out the loans and use whatever aid they could to pay its tuition. Nearly all of its revenue was derived from Title IV federal student loans, which were Corinthian's "life blood," without which the school could not continue to operate.  In its Annual Report Form 10-K for fiscal year 2013, filed with the SEC, Corinthian reported that its operations in the United States derived 84.8% of net revenue from Title IV aid programs.

46.     A for-profit company that owns a school receiving federal student aid funds is subject to the "90/10 rule," 34 C.F.R. § 668.14(b)(16). Under this rule, a for-profit college must not receive more than 90% of its net revenue from Title IV aid.  A

minimum of 10% of such an entity's revenue must come from non-Title IV aid, such as state aid, ordinary tuition payments from students, or private student loans. Schools that do not comply with the "90/10" rule risk losing their eligibility to participate in federal student aid programs; for Corinthian, this would have meant losing the source of nearly 90 percent of its revenue.

47.      In order to appear to satisfy the 90/10 rule, Corinthian made sure that the cost of attending its schools was high enough that students would not be able to pay solely through using Title IV aid. In September 2011, Corinthian's CEO distributed a presentation to his executive team, describing efforts by Corinthian to meet the requirements of the 90/10 rule by instituting "above market price increases to create 'funding gaps.'"

48.      Corinthian knew, however, that few of its students would be unable to pay the "funding gap" out of pocket, and thus most would require additional loans for this purpose. Thus, by increasing tuition, Corinthian caused students, who otherwise would have been able to pay for the entire cost of tuition through Title IV aid, to take out private student loans. Regardless of whether students were able to repay the private student loans, Corinthian would profit from the increased availability of Title IV monies. The private student loans filling this "funding gap" essentially would function as a loss leader for Corinthian.

### Corinthian Implemented the Genesis Loan Program to Fill the "Funding Gap" That Corinthian Created

49.      Before 2008, third-party providers of private education loans offered Corinthian students the opportunity to apply for loans to fund their educational expenses.

---

50.    In or about January 2008, as a result of the economic downturn, these third-party lenders ceased making private student loans available to students at high risk of default due to poor credit profiles or low income. Therefore, these sources of funding became unavailable to Corinthian students.

51.    In order to continue the flow of the needed "10 percent" of funds from non-Title IV sources, Corinthian launched its own institutional loan program – the Genesis Loan Program – which it developed together with a third-party entity ("Company A") already engaged in financing and servicing "funding gap" loans for other educational institutions.

52.    Beginning in approximately March 2008, Corinthian actively marketed, promoted, and offered Genesis Loans to its prospective and current students to pay tuition and fees that were not covered by federal aid or other sources. Corinthian's financial aid staff promoted the loan program by introducing it to prospective and current students, and by encouraging them to apply for Genesis Loans to pay for tuition and fees that were not covered by federal financial aid.

53.    The interest rates for Genesis Loans were typically substantially higher than the interest rate for federal loans. In 2011, the Genesis Loan interest rate was as high as 18% with an origination fee of 6%.  Meanwhile, the interest rate for federal student loans during this time period was 3.4% to 6.8% with an origination fee of 1%.

54.    Under the Genesis Loan Program, nearly all student borrowers were required to make monthly loan payments while attending school. The most common payment plan was called "Plan A," which required a monthly loan payment while the student was attending school. The interest began accruing after the student left school.

55.     Under the original Genesis Loan Program, pursuant to written agreements, Corinthian marketed the loan and a partner bank acted as the originator for each Genesis loan, disbursing the loan funds to Corinthian after each student's loan application was approved. Shortly after a student's loan funds were disbursed to Corinthian on the student's behalf, Company A purchased the loans from the bank. Corinthian then paid a "discount fee" to Company A equal to 50% of the face value of the loans that Company A purchased from the bank.

56.     Under the agreement with Company A, typically within two weeks after Company A purchased the loans from the bank, Corinthian purchased all of the loans from Company A. Corinthian paid Company A the face value of the loans minus any discount fee that it had already paid and Company A operated as the servicer of the loans.

57.     Accordingly, from in or about 2008 through approximately July 2011, Corinthian would own all Genesis loans that its students took out within a period of approximately two weeks after the loan funds were disbursed.

58.     In 2011, the third-party lenders who had previously been extending private loans to the small portion of Corinthian's students who were considered prime borrowers ceased lending to Corinthian students altogether.  As a result, the Genesis Loan Program then became effectively the only available source of private financing to Corinthian students.

*High Default Rates on the Genesis Loans*

59.     Although Corinthian engaged in aggressive collection efforts, the default rate on Genesis Loans was consistently extremely high. Corinthian charged off a Genesis Loan when the student borrower was more than 270 days delinquent in making

required loan payments.  Using the period in which Corinthian would classify a Genesis loan as more than 270 days delinquent and calculating the default rate based upon the number of student loans, the default rate on Genesis Loans was typically greater than 50% for all loans more than two years old, and above 60% for all loans more than three years old.

60.    Corinthian knew of the high default rates for its Genesis Loans, and at all times during operation of the Genesis Loan Program, Corinthian anticipated that the default rates would remain at these high levels.  As the Genesis Loan Program was simply a tool to achieve compliance with the 90-10 rule, Corinthian was willing to take the losses resulting from the high level of defaults for the greater reward of keeping Title IV revenue flowing to the school.

61.    Moreover, Corinthian knew the characteristics of students who were most likely to default. Corinthian required that "Schools should gather information to discern who is defaulting and why ... Internal data includes key information such as high school attended, program of study, demographics, grades, etc.".

### The 90/10 Rule Changes and Aequitas Sees a Business Opportunity By Helping Corinthian Continue To Qualify For Federal Funds

62.    Effective July 1, 2012, the 90/10 rule was changed to eliminate institutional loans like the Genesis Loans from counting toward the private revenue required to maintain Title IV eligibility.  With third-party private lenders no longer making loans available to its students by that time, Corinthian had to find another source of funding for the "10%."

63.    Corinthian determined that as long as it moved the Genesis Loans "off its books," it could still count the revenue from the Genesis Loan Program toward the 10%.

Well before the rule change became effective, Corinthian sought a third party to purchase the loans after origination.

64.     Aequitas's involvement in the Corinthian private loan program formally began in June 2011, when CSF entered into an agreement to pay approximately $24 million to purchase a portfolio of existing Corinthian student loans with a face value of $30,576,549 on a non-recourse basis.

65.     Aequitas understood from the outset, that Corinthian's business model, indeed its very existence, depended on its satisfaction of the 90/10 Rule as a condition of obtaining federal funds.  In July 2011, in its Deal Summary and Underwriting Report for Student Receivable Portfolio Purchase from Corinthian Aequitas explained Corinthian's challenges complying the 90/10 rule and how Aequitas could alleviate this compliance problem:

> Corinthian . . . has been under regulatory pressure to stay compliant with the 90/10 economics. . . Thus, an opportunity presented itself to alleviate the regulatory pressure for Corinthian by acquiring their existing student loans, as well as to enter into a longer forward flow relationship to purchase more recently originated student loans. Corinthian needs to get their student loans off their balance sheet and to stop originating student loans.

66.     As the relationship between Aequitas and Corinthian progressed, Aequitas reported internally statements by Corinthian that it was "[m]anaging to 90/10, not under" and that federal loans were Corinthian's "life blood."

67.     Aequitas further understood that Corinthian raised its tuition not to make additional money but rather to create the obligation for additional "10 %" in revenues that would give it access to the needed Title IV funds.   Aequitas told its investors that that "increasing tuition is the simplest way a school can mitigate risk from the 90/10

Rule."  Indeed, Corinthian even told Aequitas that the 90/10 Rule had "required" Corinthian to raise tuition.  Aequitas knew that the additional tuition charge, as well as the Genesis Loans that funded them, were a sham to get federal funds.

68.    In September 2011, CSF agreed to pay approximately $10 million to purchase another portfolio of existing loans with a face value of $16,792,381 on a recourse basis, meaning that if the loans became more than [90] days past due, Corinthian would purchase the loans back from CSF.

69.    Pleased with the money it was making for itself and its investors on the student loan portfolio, Aequitas sought to "deepen" its relationship with Corinthian.  In September 2011, CSF entered into an agreement with Corinthian to create a "forward flow" program, called "Corinthian 1.0."  Pursuant to that agreement, CSF purchased Genesis loans at a 40% discount on the face value of each purchased loan, and Corinthian also committed to purchase all loans back from CSF that were more than 90 days past due.  CSF agreed that each month it would purchase approximately $15 million in face value of loans shortly after origination on a full recourse basis.  The loans would be originated by a bank and immediately purchased after origination by Aequitas. Under the forward flow agreements, Aequitas had the right to purchase loans but not the obligation, and could terminate its relationship upon 14 days' notice to Corinthian.

70.    In April 2012, Aequitas sent Corinthian a list of points for discussion.  The list included allegations made by others about the for-profit education industry generally and Corinthian specifically, including  that for-profit schools "game" the 90/10 regulations by inflating tuition costs and creating a funding gap, despite knowing that most of the private loans provided would not perform.  Yet Aequitas continued to participate in and seek profit from the Genesis Loan Program scheme.

71.     Indeed, Aequitas regularly monitored the status of the various, multiplying state and federal government investigations and litigation concerning Corinthian's student lending practices, marketing to students, and job placement data post-graduation.   Knowledge of these investigations and litigation did not deter Aequitas from continuing to seek profit from the Genesis Loan Program scheme.

72.     In July 2012, Aequitas and Corinthian discussed additional ways for Corinthian to maximize its Title IV revenue.  In its internal notes of the meeting, Aequitas noted Corinthian's plans to shift more students enrolled in on-line course programs from part-time to full-time status, because "part time online students don't need gap financing" and "shifting students from part-time to full-time will create gap financing needs."

73.     Aequitas understood that Corinthian was "highly focused on maximizing starts to generate Title IV revenue flow" and that Corinthian's "quality bar [was] low."

74.     On August 14, 2012, an Aequitas executive observed that "[i]t appears as if the for profits are spending an inordinate amount of money to put anyone (qualified or unqualified) into a seat on their campus."

75.     In September 2012, the parties launched the "Corinthian 2.0" program, which was a continuation of the original forward flow program, with slightly different terms.

**_Aequitas Saw Corinthian Students As Easy Prey and Knew That Corinthian Exercised Undue Influence Over Them_**

76.     At a meeting with Corinthian executives in Santa Ana, California in June 2012, Aequitas noted that Corinthian described its competition for students as "the

couch, inertia, and gangs" and that its students were "looking to get a life, looking for a mother figure and father figure."

77.    In a January 2013 marketing presentation to Aequitas, Corinthian described its prospective student population as individuals who have "low self-esteem" and "[f]ew people in their lives who care about them"; who are "isolated," "stuck, unable to see and plan well for future"; and "impatient, [and] want quick solutions."

78.    Aequitas knew that Corinthian brokered the Genesis Loans to its students by arranging for the loans and serving as the students' single point of contact in doing so.

79.    Aequitas knew that Corinthian was advising students regarding the loans offered through the Genesis Loan scheme and that Corinthian was actively engaged in promoting Genesis Loans.

### *Aequitas Knew that Corinthian Students Were Being Harmed by High Default Rates but Sought Only to Mitigate Its Own Exposure to the Defaults*

80.    Aequitas understood that default rates on the Genesis Loan Program were high.  In March 2012, an Aequitas employee noted that Corinthian continued making institutional loans, despite the high default rates that resulted in Corinthian writing many of the loans off, "presumably because the loans lure students to its schools and give[] it access to federal student aid dollars."  In other words, Aequitas understood the Genesis Loan Program was intended to be a loss leader for Corinthian.

81.    Aequitas understood that Corinthian expected students would, more often than not, be unable to repay their Genesis Loans.  In conducting diligence, Aequitas noted that "[d]espite the dismal performance of [the Genesis] loans, Corinthian

executives told investors in summer 2011 that they planned to double the volume of private loans made through the institutional loan program . . . ."

82.     The same Aequitas employee noted "with defaults this high, how can we defend our practices?"

83.     Indeed, despite the fact that Aequitas knew that the tuition charge funded by the Genesis Loans, as well as the Program itself, was merely a ploy to obtain access to federal funds, Aequitas disregarded the high default rates on these sham loans.

84.     Aequitas understood the harmful impact of student loan defaults on students. For example, Aequitas learned that private student loans like the Genesis Loans were difficult to discharge in bankruptcy, "making them more onerous than credit-card debt or subprime mortgages."

85.     Aequitas was well aware that, in 2008, when Corinthian began its loan program, the default rates for these loans were between 50% and 70%.

86.     Aequitas's initial models in 2011 predicted a 45% default rate.  In October 2012, Aequitas revised its models upon a finding that default rates were in the mid-50% range.  Aequitas estimated that it could cover the cost of investor funds if the cumulative default rate reached 63% even if Corinthian defaulted on its obligations to purchase the loans.

87.     In December 2012, Aequitas's Underwriting Report recommended Aequitas continue purchasing Corinthian's loans, despite an expected default rate of 57% for the loans purchased as part of the 2.0 forward flow agreement with Corinthian.

88.     In October 2013, Aequitas concluded that the loans purchased in June 2011 had a default rate of 63%. Aequitas estimated that the default rate for the full term of these loans would be 66%.  Moreover, Aequitas determined a default rate of 50.9% for

loans in the Corinthian 1.0 program and an estimated default rate of 61% for the full term of the loans.

89.     Aequitas understood Corinthian was not concerned about the high default rates because, from Corinthian's perspective, the purpose of the Genesis Loan Program was to receive Title IV funds and avoid 90/10 Rule compliance problems.

90.     For Aequitas, the high default rates were simply an investment risk to be mitigated. As long as the loans performed within Aequitas's projections and Corinthian assumed the risk of purchasing delinquent and defaulted loans, Aequitas made money on the loans.  Corinthian was willing to assume that risk because the pretense of a third party funding the Genesis Loan Program allowed the school to stay in compliance with the 90/10 rule.

91.     Despite its knowledge of the high default rates and the effect of defaults on students, Aequitas continued funding the Genesis Loan Program.  Aequitas continued to seek out ways in which it could work more closely with and fund more loans for Corinthian, ultimately agreeing to do so several times via renewed funding agreements.

92.     In the meantime, Corinthian students who defaulted on Genesis Loans suffered harmful consequences including negative credit reporting, along with consequences that flow from that. Negative items on a credit report like defaults can result in difficulty in renting an apartment, denial of employment, ineligibility for other forms of financing, or eligibility only on less favorable terms than would otherwise have been available.

93.     In addition, Corinthian students were and are harmed by Aequitas's continued collection of payments on loans that carried interest rates as  high as 18% and origination fees as high as 6%.

***Aequitas Was Aware of and Disregarded Increasing Scrutiny of Corinthian's Business Practices***

94.     Aequitas was aware of allegations of wrongdoing by Corinthian and ignored numerous red flags regarding Corinthian's deceptive acts and practices.

95.     In a 2011 Deal Summary and Underwriting Report to investors concerning Aequitas's purchase of a portfolio of loans in 2011, Aequitas summarized the numerous lawsuits against Corinthian.

96.     For example, the summary noted that Corinthian was facing three *qui tam* false claims actions alleging violations of the Higher Education Act regarding the manner in which admissions personnel were compensated.

97.     The summary also observed that Corinthian had experienced an "unprecedented increase" in putative class action lawsuits brought by former students in the second, third, and fourth quarters of the 2011 fiscal year.  Aequitas explained that Corinthian "believes these lawsuits are largely the result of negative publicity" and noted that binding arbitration clauses required nearly all of the students to resolve their cases through individual arbitration.

98.     Aequitas was aware that in 2012, Corinthian was being investigated by state attorneys general for Florida, California, Massachusetts, Illinois, New York, and Oregon for alleged wrongdoing including misrepresentations regarding job placement and career prospects.

99.     In 2012, Aequitas was aware of the Bureau's investigation into Corinthian's practices.

100.    Aequitas was also aware that in October 2013, the State of California sued Corinthian, alleging "false and predatory advertising, intentional misrepresentations to

---

students, securities fraud and unlawful use of military seals in advertisements."
According to the California complaint, Corinthian's "predatory marketing efforts
specifically target[ed] vulnerable, low-income job seekers and single parents who have
annual incomes near the federal poverty line."

101.    Aequitas's periodic written internal memoranda about its business
relationship with Corinthian indicate Aequitas failed to perform any meaningful due
diligence concerning Corinthian's marketing and representations to its students.
Instead, Aequitas took at face value Corinthian's assertions that the lawsuits and
investigations were without merit or easily disposed of.

***Despite The Many Red Flags, Aequitas Continued Its Partnership With
Corinthian and Its Expansion Efforts For the "EducationPlus" Loan
Program***

102.    In June 2012, at Aequitas's request, the agreement between Corinthian
and Aequitas was amended to include a provision that barred Corinthian from
endorsing any tuition loan program other than Aequitas's.

103.    In a December 2012 internal report, Aequitas noted "we enjoy regular
interactions with Corinthian's CEO and CFO, allowing us to increasingly become a
strategic partner to Corinthian."

104.    In or about 2013, Corinthian and Aequitas renamed the Genesis Loan
Program the "EducationPlus" loan program. The EducationPlus loan program resulted
in lower interest rates being offered to Corinthian students, but was the functional
equivalent of the Genesis Loan Program and Aequitas's and Corinthian's respective roles
did not change. Corinthian management and staff often referred to the EducationPlus
loan program as the Genesis Loan Program. (References in this Complaint to the
Genesis Loan Program and Genesis Loans include EducationPlus loans.)

105.    Aequitas began marketing the EducationPlus program to other for-profit schools as a "turnkey solution" to provide funding for their institutional loan programs. Aequitas did this because it saw the scheme it was running with Corinthian as a profit center, disregarding the fact that it was a sham that harmed the student borrowers who were caught up in it.

### Only When Aequitas Deemed the Forward Flow Program too Risky to Aequitas Did It Cease Funding Loans

106.    In January 2014, Aequitas exercised its option to withdraw from the loan program and stop purchasing Genesis Loans originated through Corinthian.

107.    Aequitas management made the decision based on "increased operational risk at Corinthian" and "headline risk to Aequitas." Aequitas was concerned that state and federal investigations of Corinthian could ultimately affect the underlying value of the Genesis Loans they were funding.

108.    However, from February 2014 through May 2014, Aequitas and Corinthian continued to discuss additional opportunities to continue working together, which Aequitas said would require additional insulation from defaults and other risk in the loan portfolios.

109.    In May 2014, Corinthian stopped honoring its obligation to purchase all loans from CSF that were more than 90 days past due.

## COUNT I

## AEQUITAS VIOLATED THE CFPA'S PROHIBITION ON ABUSIVE ACTS AND PRACTICES BY FUNDING AND SUPPORTING THE GENESIS LOAN PROGRAM

110.    The allegations in paragraphs 1 through 109 are incorporated here by reference.

111.    Section 1036(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), makes it unlawful for a covered person to engage "in any unfair deceptive, or abusive act or practice."  An act or practice is abusive under the CFPA if it "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service. . . . " 12 U.S.C. §§ 5531(d)(2)(B).

112.    The Genesis Loans sold by Corinthian to its students and funded by Aequitas were consumer financial products.  12 U.S.C. §§ 5481(5), (15)(A)(i).

113.    Aequitas is a "covered person"" under the CFPA, 12 U.S.C. § 5481(6) because it acquired or purchased consumer loans, the Genesis Loans.

114.    From at least September 2011 until February 2014, Aequitas and Corinthian engaged in a complex scheme designed to maximize the flow of Title IV federal loan dollars to Corinthian and satisfy its obligations under the "90/10 Rule."

115.    Under the "90/10 Rule," Corinthian was barred from receiving more than 90% of its revenue from Title IV federal student aid.  At first, Corinthian sought to satisfy the "10 %" by charging additional tuition, above what federal aid could cover, to ensure that a "10 %" would be forthcoming. Knowing that its students could not generally afford the "10 %" additional charge out of pocket, however, Corinthian created

and funded the Genesis Loan Program to cover that, acquiring the Genesis Loans within days of their origination by a bank.

116.     As of July 1, 2012, private student loans originated and owned by an institution of higher education, such as the first version of Genesis Loan Program, would no longer count toward the 10% of private revenue required for a school to maintain eligible to receive Title IV funds.  As a result of this change to the 90/10 Rule, Corinthian sought a third party to immediately purchase the loans after origination, thereby keeping the loans off Corinthian's books so that they could be counted as a private source of revenue for purposes of the 90/10 Rule.

117.     Aequitas agreed to take on that role in the scheme, which permitted Corinthian to continue offering Genesis Loans to students, despite no longer being able to hold those loans on its books, and without increasing its non-Title IV sources of revenue from other sources.

118.     Aequitas knew that Corinthian sought no economic benefit from the Genesis Loan Program or the tuition payments it was intended to fund except for Corinthian's access to the Title IV program. Aequitas knew that the additional tuition was charged by Corinthian simply to create revenue that would satisfy the "10 %" required to obtain federal funds. Aequitas knew that the high projected default rate of the program meant that Corinthian, which was bound to buy all delinquent Genesis Loans from Aequitas, would not actually realize that "10 %" because the cost of buying back non-performing loans and maintaining the program would absorb any such revenue.

119.     In short, Aequitas knew that the Genesis Loan Program, and the tuition charge it funded for Corinthian student-borrowers, was a sham.

120.     Aequitas participated in the loan programs in order to earn the profit from the performing loans it expected to keep.

121.     Aequitas knew but disregarded the harm to Corinthian student borrowers caused by this scheme.  While Aequitas made what appeared to be an easy profit, with Corinthian buying back delinquent loans, student borrowers would have to pay high-interest, high origination fee loans back for illusory tuition that Corinthian never expected to recoup. Aequitas knew but disregarded the fact that most Corinthian student borrowers would default on these loans and would suffer the consequences of such defaults.

122.     Student borrowers were not able to protect their interests in selecting or using the Genesis Loans because they could not have known or understood that Corinthian and Aequitas were using the Genesis Loans, and the tuition charge they funded, as a loss leader and a ruse designed to generate Title IV federal loan revenue for Corinthian, and because most borrowers did not have other options to pay for Corinthian's artificially-inflated tuition.

123.     Aequitas took unreasonable advantage of student borrowers' inability to protect their interests in selecting or using the Genesis Loans by funding, supporting, and maintaining its purchase of Corinthian student loan portfolios and by participating in the Genesis Loan Program through the "forward flow" agreements with Corinthian, all while continuing to reap significant profits from the scheme.

124.     Corinthian students, the great majority of whom had few financial resources to begin with, were and are harmed by Aequitas's continued collection of unaffordable payments on loans that carried interest rates as high as 18% and

origination fees as high as 6%, which translates to thousands of dollars for each student over the life of the loan.

125.    Many Corinthian students were and are harmed by defaults on their student loans, which exacerbate their financial distress, are difficult to discharge in bankruptcy, and will detrimentally affect their credit ratings for years.

126.    Therefore, Aequitas violated the CFPA's prohibition on abusive practices, 12 U.S.C. § 5536(a)(1)(B).

## **PRAYER FOR RELIEF**

Wherefore, the Bureau, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's power to grant legal or equitable relief, requests that the Court:

    a.   permanently enjoin Aequitas from committing future violations of the CFPA;

    b.   declare that Aequitas engaged in abusive conduct when it funded and implemented the Genesis Loan Program in order for Corinthian to carry out the 90/10 scheme.

    c.   permanently enjoin Aequitas from collecting loan payments from the affected borrowers;

    d.   order Aequitas to pay restitution to consumers harmed by its unlawful conduct;

    e.   order Aequitas to pay damages to consumers harmed by its unlawful conduct;

    f.   order Aequitas to disgorge all ill-gotten profits;

    g.   order the rescission of all Genesis Loans originated or funded by Aequitas or

its subsidiaries since July 21, 2011;

h.  enjoin Aequitas from making further investments in student loan products;

i.  impose civil money penalties against Aequitas;

j.  order Aequitas to pay the Bureau's costs incurred in connection with bringing this action; and

k.  award such other and additional relief as the Court may determine to be just and proper.


Dated:  August 17, 2017                    Respectfully submitted,


Anthony M. Alexis, DC Bar 384545
Enforcement Director

David Rubenstein, DC Bar 458770
Deputy Enforcement Director

Cynthia Gooen Lesser, NY Bar 2578045
Assistant Deputy Enforcement Director


 /s/ Rina Tucker Harris_____
Rina Tucker Harris, DC Bar 444550
Mary K. Warren, NY Bar 2557684
Jessica Rank Divine, NY Bar 4544573

Attorneys for Plaintiff
CONSUMER FINANCIAL PROTECTION
BUREAU